# Richmond

## Beulah Shank v. J. F. Craun, et als.

November 15, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*George S. Harnsberger,* for the appellant.

*Ward Swank* and *Herbert W. Wyant,* for the appellees.

Epes, J., delivered the opinion of the court.

This is a suit brought by J. F. Craun and W. J. Kaylor against E. M. Shank and Beulah Shank (husband and wife) to set aside a deed, dated September 24, 1932, from E. M. Shank to Beulah Shank.

The bill sets forth and the proof establishes that on September 24, 1932, E. M. Shank was indebted to W. J. Kaylor in the sum of $180, and E. M. Shank and Beulah Shank were indebted to J. F. Craun as evidenced by three notes drawn by them for $281.18, $298.93 and $177, respectively; and that in November, 1932, these creditors procured judgments on their claims.

The ground upon which the complainants seek to set aside the deed is that it "was not upon a consideration deemed valuable in law, or upon an adequate consideration, but was executed with intent to hinder, delay and defraud the creditors of E. M. Shank and especially your orators."

Lago and Stickley and J. V. Lago filed petitions setting forth that on September 24, 1932, E. M. Shank was indebted to F. H. Lago and Sam S. Stickley, partners trading as Lago and Stickley, for $175.72, and to J. V. Lago for $150, and prayed to be admitted as parties complainant to this suit.

Mrs. Shank filed answers to the bill and the petitions. E. M. Shank did not appear, and the bill stands taken for confessed as to him.

These facts appear from the evidence:

By deed dated March 1, 1926, Irma Shaver, W. D. Funkhouser and others conveyed to E. M. Shank and Beulah Shank a farm in Rockingham county, Virginia, containing about fifty-three acres. The consideration for the convey-

ance was $9,500, of which $4,000 was paid in cash and the residue evidenced by five notes for $1,100 each drawn by E. M. Shank and Beulah Shank, payable to the order of William M. Funkhouser, attorney in fact, on or before March 1, 1927, 1928, 1929, 1930 and 1931, respectively, with interest at six per centum per annum payable annually. A vendor's lien was reserved in the deed to secure the payment of the deferred installments.

Mrs. Shank testified that she paid $1,700 of the cash payment out of money she had been accumulating since 1915 from the sale of chickens, eggs, turkeys, guineas, and now and then a hog raised by her, and that $2,300 of it came from money which her husband's father left him several years before.

On May 2, 1927, all five $1,100 notes were paid, marked paid, and delivered to either Mr. Shank or Mrs. Shank, and the vendor's lien released of record. Of the money used to pay off these notes $3,300 was procured by the negotiation of a loan for that amount from J. F. Craun. This indebtedness was evidenced by four bonds (three for $800 and one for $900) dated May 2, 1927, made by E. M. Shank and Beulah Shank, payable to J. F. Craun on or before May 2, 1928, 1929, 1930 and 1931, respectively, bearing interest at five per centum per annum payable semi-annually, which were secured by a deed of trust on the fifty-three acre farm. The residue of the money required to pay off the $1,100 notes amounted to $2,530, of which $230 was for interest. Mrs. Shank testified that she paid all this $2,530 from funds she saved from the sale of poultry, eggs, etc., but that one of the $1,100 notes paid therefrom "was paid through Elvin's name, Mr. Shank's name." She further testified that she attended to procuring the loan from Craun and to the payment of the five $1,100 notes.

On May 2, 1928, the interest on the four Craun bonds and $365 of the principal of the first bond was paid. On May 2, 1928, remainder of the principal of the first $800 bond and the interest to that date on the other three bonds was paid, the payment amounting to $581.75. On May 2, 1930,

the interest to that date on the three unpaid bonds and the principal of the second $800 bond was paid, the payment amounting to $925. When these two bonds were paid they were marked paid and delivered either to Mr. or Mrs. Shank. Each of these three payments was made by a check drawn by Beulah Shank upon an account standing in her name in the First National Bank of Harrisonburg. Mrs. Shank testified that, with the exception of $50 turned over to her by her husband at the time the payment of May 2, 1928, was made, each of these checks was paid with money she had accumulated from the sale of poultry, eggs, etc.

No other payments have been made on either the interest or the principal of the Craun bonds; but some time prior to September 24, 1932, E. M. Shank and Beulah Shank executed and delivered to J. F. Craun their note for $177 of which $85 was for one year's interest on the unpaid $800 and $900 bonds. The residue of the $177 note was for mill feed and flour and for "a little money" he had loaned them. This note is one of the notes upon which Craun procured the judgment on which he is here suing; but it is the only item of indebtedness alleged by the complainants or petitioners which has any connection with the property conveyed in the above mentioned deed.

By deed dated September 24, 1932, in consideration of $1 and "the further consideration of the assumption by the party of the second part (Beulah Shank) of the payment of two homestead waiver bonds, dated May 2, 1927, made by E. M. Shank and Beulah Shank, one in the sum of $800 * * * and the other in the sum of $900 payable * * * to J. F. Craun, with interest from May 2, 1932," secured by deed of trust on the below mentioned land, E. M. Shank conveyed to Beulah Shank, with general warranty, "all his right, title and estate in the following real and personal property" in Rockingham county, Virginia:

(1) A tract of land containing fifty-three acres seventeen poles conveyed to E. M. Shank and Beulah Shank by Irma Shaver and others by deed dated March 1, 1926:

(2) "The following stock and chattel property, located

upon the aforesaid farm, namely:" Two mules, one old mare, two cows, four yearling heifers of mixed breeds, two Poland China brood sows, two shoats, ten Poland China shoats, one John Deere two-horse wagon, one Milwaukee binder, one McCormick mower, one McCormick Deering manure spreader, one Superior drill, plows, harrows, and other farming implements, three sets of work harness, a DeLaval cream separator, twenty-four ewes and one buck; all fowls, and all household and kitchen furniture.

The one-half interest of Elvin M. Shank in the real estate and the personal property conveyed in this deed is worth very considerably more than $850.

When first questioned about this transaction Mrs. Shank testified most positively that at the time the above mentioned deed was executed and delivered to her, she did not know her husband owed to the complainants or the petitioners any of the debts upon which they are here suing. But at a later time she was recalled to the stand and modified this, saying that she did not know of them until a short time before the deed was executed.

The court being of opinion "that the deed * * * bearing date on the 24th day of September, 1932, * * * was voluntary, and was made to hinder, delay and defraud the creditors of said E. M. Shank, * * * and that said Beulah Shank had knowledge of the said fraudulent intent and purpose of the said E. M. Shank, in the execution of said deed," decreed that the same be and is "hereby set aside and held for naught, but so far only as the said debts and demands of said plaintiffs and petitioners are concerned." It then committed the cause to a commissioner in chancery to make certain inquiries which need not be noticed here.

Mrs. Shank has appealed from this decree alleging that the court erred in decreeing that the deed from E. M. Shank to her was voluntary and fraudulent.

The gist of her contention is this: The farm was conveyed to her and her husband jointly, and they were jointly obligated for the payment of the purchase price and the Craun indebtedness incurred to pay it off; but as between

themselves each was obligated for the payment of one-half of the purchase money. The total amount, principal and interest, which has been paid by her and her husband on the purchase price (other than from borrowed money which remains unpaid) is $8,566.75. Of this her husband has paid only $2,350, while she has paid from her own funds $6,216.75, which is $1,933.38 more than one-half of what has been paid. By reason of her having paid $1,933.38 more than one-half of what has been paid on their joint debt, her husband was indebted to her in this sum. That indebtedness *and* her husband's one-half of the $1,700 unpaid Craun bonds (which she assumed), constituted the consideration for the conveyance made by her husband to her, and was an adequate consideration therefor.

There is evidence which tends to show that $2,783.38 ($1,933.38 plus $850) was not an adequate consideration for the one-half interest in the farm and the personal property conveyed by Mr. Shank to Mrs. Shank; but even if it was, the evidence does not establish with the clarity which the law requires in such cases that Mrs. Shank has paid out of her own funds more than one-half of the $8,566.75 which has been paid.

The evidence supports her contention that from 1915 to 1930 she was raising and selling poultry, eggs, once in a while a hog, and after 1927 some sheep, and that the proceeds of such sales were legally her funds, as distinguished from those of her husband; and that whatever she paid on the purchase price of the farm and the lien debts placed thereon by her and her husband was paid from money derived originally from such sales. It further leaves no doubt that she did pay from money so derived considerable amounts toward the purchase of the farm and the payment of the debts incurred for that purpose. But upon an analysis of her own evidence there is much to cast doubt upon the correctness of her testimony that all except $2,350 of the $8,566.75 was paid by her from her own funds.

The evidence shows that from 1915 to 1930 Mr. Shank had no bank account, though his sales of crops and farm

products amounted each year to considerable sums; and there is no evidence to show what he did with but very little of the money so received by him. During this period Mrs. Shank at all times had a bank account, and for most of the period two, one a checking account and one a savings account. The checks drawn on these accounts show that much of the expenses of the family and farm were paid by checks on these accounts. At first Mrs. Shank testified very, very positively that *all* the money deposited in these accounts was her money and that none of her husband's funds had been deposited therein. But she later admitted that three deposits aggregating $1,470.75 were funds belonging to her husband. These and other facts and circumstances tend strongly to show that despite Mrs. Shank's testimony to the contrary, the several bank accounts standing in her name were used jointly by E. M. Shank and Beulah Shank as depositories for the funds of both.

These facts and other inconsistences in Mrs. Shank's testimony were sufficient to warrant the court in holding that the evidence was insufficient to establish that Mrs. Shank had paid from her own separate funds more than one-half of the $8,566.75 which she and her husband have paid.

In this connection it is to be noted that the bill stands taken for confessed by E. M. Shank, and that he has not testified in the case. So far as the record discloses he and Mrs. Shank are living together and upon good terms; and there is nothing in the record which suggests any reason for her not having called him to testify, other than that he would have not corroborated her testimony.

Even if it be granted that Beulah Shank paid more than one-half of what has been paid on account of the purchase of the farm, her own evidence tends strongly to show that, when she made these payments, she did not expect her husband to repay her. On cross-examination she testified in part as follows:

"Q. Did you expect your husband to repay you any debt

which you paid which is evidenced by any check introduced here?[1]

"A. Well, I expected to get the home. I expected to get the home paid for.

"Q. Did you expect your husband to repay any of these checks?

"A. No, I wasn't expecting him to pay back. But I thought if I paid for the place, it was mine.

"Q. There was no written agreement between you and your husband as to what share he was to have, or what share you were to have?

"A. No.

"Q. It is your contention * * * that you have advanced more than one-half of what has been paid, part of the purchase of this farm. On making any of those payments which you made, did you take from your husband at any time any promise in writing to reimburse you for those payments which you were making?

"A. No, but I felt like it was due me.

"Q. You did not expect to be repaid by your husband, did you?

"A. He admitted himself that he owed it to me because he didn't co-operate with me and didn't do his part. He admitted that it belonged to me.

"Q. At the time you made the advancements, did you not expect it to be repaid to you in money?

"A. I was expecting the home myself.

"Q. You did not charge any of these payments against him, these payments which you made which were evidenced by these checks?

"A. Only in mind."

We are of opinion that the chancellor was correct in holding that the deed from E. M. Shank to Beulah Shank was a voluntary conveyance; but we are also of opinion that the evidence shows that the fowls and sheep conveyed

---

[1] She had introduced a large number of checks including some checks given by her for payments on the farm debt and many given by her for family and farm expenses.

in that deed were the individual property of Mrs. Shank, and that she had and has title thereto regardless of that conveyance and of the decree setting it aside.

The decree will be modified to provide that the decree setting aside the deed from E. M. Shank to Beulah Shank shall not operate to divest Beulah Shank of the title to and ownership of the fowls and sheep therein mentioned; and, as so modified, it will be affirmed.

*Modified and affirmed.*